Who's up here? If it pleases the Court, Your Honor, Treva Hearn on behalf of the plaintiffs Robert Hager and his children who are present in the courtroom. Well, I think we're – Treva Hearn, you're on behalf of the appellants? I am. Appellants. Hager. That's correct. Okay. I think that our – We just – the clerk's office flipped the names of the counsel. Oh. And you are – are you Donald Lattin? Yes. Sir, thank you. Oh, okay. Clerk is claiming Harding, Ese. Okay. And it is Harding, Ese. Thank you. Okay. Now we're set. Thank you. Thank you. If it pleases the Court, the plaintiffs in this matter had provided the lower court with sufficient evidence to be entitled to go forward on the merits of the federal claims. If needed, or to amend the complaint to conform to the proof and evidence discovered. There were two federal claims. One, of course, the Racketeer Influenced and Corrupt Organizations Act claim. And the second was the claim under the 14th Amendment that lost property and equal protection denial. Because these two federal claims are so fact-intensive, it was important that the facts be summarized and put before the Court, and that there be adequate time for us to put all of those facts before the Court. The plaintiffs absolutely believe that these defendants set themselves up in a situation in which they could bill at will the Petroleum Fund of the State of Nevada, which is a fund that contains millions of dollars collected in gas tax funds that then is then accessed for the recovery of sites that have had leaks from underground tanks. The facts presented to the lower court demonstrate why plaintiffs were treated differently and the acts, the fundamental due process, were denied to them. What is important to understand is that the complicated fact situation that the plaintiffs were forced to put before the Court. But what is very simple, and because of these facts and the way they fit together, what is very simple to understand is that the defendants placed themselves in a position where they could continue to access that fund. All they had to do was, under their contract, advise the State an emergency existed and that they would take over, and then they were in charge of the cleanup, and then they were in charge of the billing. They were in charge of how much was paid. They were in charge of the scope. They were in charge of determining. Now, the facts of this case are unclear. But could I just step back to one fundamental that I'm not sure I divined from either the district court or the briefing, and that is what is the predicate act under RICO? The predicate act is having enterprise that is set in a position that it can overcharge, and the predicate act, based upon fraud, overcharges. Okay. So can I stop there? So it's, you know, the statute is, like, really long and detailed, but so you have to find a place in the statute that you land, and you're saying that your predicate offense is a fraud. Correct. Now, the fact of the matter is that RICO has a predicate act overcharging, and supplying this overcharging in a situation, as I will explain in this fact situation, wherein before the bankruptcy court, when this property was forced to be sold, that there were, again, overcharging or overstating what the cost would be to place this plaintiff, this appellant, in a position that he was forced to sell his property. First of all, consider the scene. I'm sorry, Your Honors, and I meant to ask if I could reserve five minutes. I should have asked that at the beginning. To help keep track of your own time. Okay. First of all, set the scene where Lake Tahoe, Lake Tahoe has some of the most astronomically priced property in the United States of America. Having that property means that there will be no deals unless you look at the facts of this case. Racketeering is fixed in our mind as something that organized crime does. But the United States Congress was not that narrow. In its framework, it looked at what happens when persons who are in an otherwise legitimate enterprise accomplish an nefarious end that lends profit to the racketeer and deprives the victim of his property, with a threat that this enterprise could repeat or continue, which is, of course, the most important element in this case. The lower court correctly pointed out that RICO is a conduct of an enterprise through a pattern of racketeering activity and the defendant causes injury to the plaintiff's business or property. For these elements, the lower court cited all the appropriate cases, Sedema, H.J. Inc., Schreiber Distributing, Howard v. America Online. From these cases, the Court found there was no issue regarding conduct of an enterprise. That was fulfilled. The lower court delineated the issues about which there was a dispute, or he felt not a dispute, but we say there was a dispute of material fact, as to the racketeering itself and the harm to the plaintiff. It is upon these two issues that I focus this particular rendition of the facts, the summary of the facts. Although the facts are complicated, the fact is that everyone who had an underground tank between 1996 and 1998 was going to have to take it out of the ground because there had to be double-walled tanks, more monitoring, and so on. When Plaintiff Hager purchased this property, he knew that. He signed up to be in the insurance. He knew the liability. He was subject to a lease. He knew that that gasoline station was going to be operated. That's not why he purchased the property, but he covered himself on that. What was important then was when he tried to access that fund, when the tanks were removed, NDEP, that's the Nevada Department of Environmental Protection, says there was a leak. His engineer said there was not a leak. That dispute went on for a long time. But when he finally said, okay, let's access the fund because I'm enrolled, they denied it. Had that not occurred, no one would have been watching what happened next. They being who? Harding and the state of Nevada. If that had not occurred, no one would have been watching what occurred next because generally when the state takes over a site to clean it up, there's no operator, no owner, nobody around, and that's why they're there so they can access the fund at will and no one would have noticed. But in this case, because he was denied the fund coverage and because he existed and was watching, he noted the overcharging. Well, counsel, let me just, I guess maybe I'm missing something here. But was this decided on summary judgment? Yes, it was. Now, it sounds a bit like your argument is that you were charged too much. It is part of the argument. But the fact that they were in a position to charge too much is the crux of it. Well, I guess I don't understand what you mean by they were in a position to charge too much. And why is that fraud? And what is the evidence that that was fraud? Because they had a contract with the state of Nevada to advise the state. They. Harding. The defendants. Because they had that contract. The defendants were in a position to not only advise the state, but also determine the scope and what would be charged in that cleanup. There were no. Why is that fraud? Weren't you, didn't you know that? We did not know that it was fraud until we had. You knew the relationship, didn't you? Of course. We were told when we went to the court in Minden and they said we're taking this over because of the second emergency situation, that they're taking over the cleanup. The fact is, is that until that moment, the owner is in charge of the cleanup. But when the state determines that it's an emergency based upon the advice of their  I guess I'm not understanding where the fraud is, where there's the evidence of fraud. This all proceeded in accordance with the things that you were fully aware of. Because then they could access the petroleum fund without oversight, without someone saying, wait, as our expert witness showed, that only costs $1,200, not $120,000. That only should cost this, not that. And so he went through $48,000 worth of expertise in 44 boxes of information to determine that they were charging and cleaning up a site that had a Coke can worth of hydrocarbons on it at most. If we took that as a given that you had alleged enough of a predicate act, you still have to go back to the statute on the pattern issue. And I'm, frankly, having some difficulty understanding what is the pattern for future repetition or the threat based on this record. The contract is let by the state for a contractor to advise them on underground cleanup. That same contractor becomes the contractor who will clean up the site upon the advice of themselves. Here's the State. We are asking your advice. Does this need to be cleaned up? Yes. And it's an emergency. You need to take it over. Now we're in charge of that site. We're in charge of charging for that cleanup. Right. So there you have a bad act, at least hypothetically. But what's the pattern that brings it under RICO? And that's the difficulty. RICO, it's not just a fraud statute. It's a fairly, as you know, technical statute that you have to fit in between. And I'm really having trouble understanding the future repetition. Can this happen again? Of course. Only in this situation did you have someone who noticed. Again, we don't know. I mean, that's what I'm having trouble with. Why is it going to happen again? How do you know that enough to get a pattern? Because. It's happened once in your view, right? That's correct. That's all the evidence. But let me tell you, the very next person who purchased the property was also driven into bankruptcy by overcharging. And their contractor, Harding. Because the most important point is, is how much, where is the check to see how much it should cost? The engineer determines what the scope of the cleanup is, how much it will cost. And when the cleanup's done, they go to the State and say, well, we're done now. It seems to me like you might have like a conflict of interest claim under Nevada State law, but I don't see a RICO claim. That's. The threat of it happening and recurring again and again, when there is a fund sitting there and a contractor can access it, what better situation could they be in? Well, it may be a bad system as a matter of public policy. And there may be a conflict of interest that there's a State court remedy for. But I move on then to tell you that the second Federal claim is why this case is important also. Someone was deprived of their property without due process. We give a lot of latitude to environmental cleanups. There's no doubt of that. We say, well, it's important to clean up the environment, so go and do that. But it didn't mean to take someone's property from them without them having the right to say, you're spending too much. There's a dispute about the scope. Something should not happen here. There was a conspiracy to keep him from the petroleum fund so that he could be. But Lake Tahoe is a national treasure. Absolutely. And you can't have or can't await cleanup waiting for people to have the 10 years of litigation on how much should this cost to clean it up. It really has to happen. But at one point, someone has the right to determine whether those costs are reasonable compared to what was cleaned up. Let's talk about a Coke can, which is not that much larger than this cup. And $1.2 million was spent on the cleanup. Not only that, my client faced a claim from the State of $21 million fine. He was pressured into a situation where he had to claim bankruptcy in order to protect himself, as did the next owner of the property. That should not happen. That should not be the result of a cleanup of property to save the environment that someone is deprived of their due process and their equal protection under the law in order for those things to be cleaned up. What has to happen is someone has to watch that a contractor is not in a position to bill at will. That is the problem, and that continues. That will continue into the future. Unless this Court says you cannot, we will punish people who do that, we must have a system that does not. What is the constitutional violation? It's a deprivation of property? That's correct. And what is the deprivation or the loss of value of property that we would look to, to see whether or not there's a constitutional violation here? Well, the value itself, he was forced into a situation where in the bankruptcy proceeding, he had the property for sale for $1.4 million, and also he had brought a buyer who would allow him to retain a development interest. But Harding had, the defendants herein, had a client who came in. But it seems to me that it's basically you're back to your overcharge. It's the overcharging charge. And at that point, yes, they submitted and backed up the Deputy Attorney General who, and told, it was Harding's letter that supported the Attorney General saying that $250,000 would be the required remainder of the cleanup, although they had made an agreement, which was, is evidence that we supported in the credo indication that they had told him the max would be $50,000. He had an agreement with the State, that second bidder. And so when the Attorney General stood up and said all of those things, he knew they weren't true. He knew that he had a maximum. I guess I'm having some difficulty here because you seem to be mixing and matching between fraud, which seems like you're describing, and a constitutional violation, because they're not the same thing. Well, but when the State is going through a process whereby they engage in fraud and deprive someone of their due process, their property without due process. I understand.  May it please the Court. Don Lattin on behalf of Harding ESE and the other appellees. And I wish I could stand before you and say this was a case of first impression, but it is not. It is a factually intensive case. And as you know, under the Bomber case, if there's anything in the record to support this, this Court can affirm the decision. And this was a case that at the district court level was summary judgment was granted in favor of my clients, and the record adequately supports that. It is not my intent to stand before the appeal court and argue the facts. Suffice it to say that in our brief, there are very specific sites to the record which support the facts that are in question. With that said, there will be some brief discussion of some of the important facts. But as the Court has noted, the Court indicated two things at the lower level. First, there were no predicate acts. And second of all, there was no pattern. And in making that finding, they looked at some key facts. And what the Court needs to realize is under the provisions of the Nevada Division of Environmental Protection, the appellant hired his own engineers, not the appellees, but his own engineers, and they are the ones that do what's called a corrective action plan and a site characterization. His own engineers are the ones that determine the cleanup costs. His own engineers are the ones that determined that this was an emergency, not my clients. Harding is what's called an on-call, task-oriented contractor with the State. And what happens is when the State of Nevada does not have the expertise within its department, they, on an on-call basis, would contract with my client to review, and in this case, test results. The record will reveal that the site characterization plan and the remediation equipment was already installed on the property already up and going when my client was asked by the State to review test results. That's supported in the record, and that's indicated in my brief. So they concluded that there was no predicate acts. And as the Court has already aptly noted, there was only one instance. So based upon this one instance and this one series of events, there's no pattern. If under RICO you find that there were predicate acts, you determine that there was a pattern, there was no damage. And what's important in this case and what, again, is supported by the record is that the appellant in this case filed bankruptcy. He requested the court to sell this property. He requested the bankruptcy court to approve the sale for $1.4 million, which is, again, supported in the record. That was the sale price. So he requested the sale of the bankruptcy court, and the bankruptcy court approved it. So there was no damage, even if you find that there were predicate acts and there was a pattern. Now, with regard to the due process claim and the 1983 claim, the district court ruled that Harding, my client, the appellee in this case, was not a state actor. Again, that is supported by the record. And in our brief, there are very specific excerpts in the record which support that claim. There was no damage. Take if the state court ordered the cleanup. Well, what happens in the State of Nevada is the Nevada Division of Environmental Protection, they ordered the cleanup. Okay. And they ordered the cleanup, again, prior to the time that Harding was involved in this case. And once the cleanup is ordered, the appellate in this case hires his own engineers to do the site characterization and the remediation plan. So with regard to the 1983 action, the court correctly determined at the lower level that there was not a sufficient nexus between the state and the action. And Harding, again, is an independent contractor with the State of Nevada, and under the Brentwood case, there was nothing to overcome to show the sufficient nexus that the state, that showed that there was state action. Again, that's supported in the record. I don't want to have an argument over the facts before the appellate court, but that is supported in the record. There was not a sufficient nexus between the state and the challenged action to support, to say that Harding was a state actor sufficient to support a 1983 claim. So based upon that, those clear facts, the court, again, dismissed that case. In the record, there are, again, some very key facts, and they're referenced, again, in our brief. The first one is that the Nevada Division of Environmental Protection, not Harding, retained full control over this site. They made the decisions, not my client, and that's supported in the record in the supplemental excerpts at 172 and 177. The other critical fact is that the emergency situation that was declared here, that precipitated the Nevada Division of Environmental Protection to get involved in this, was a letter that was sent by Mr. Hager's engineer, the appellant in this case, to the state indicating that it was an emergency. It wasn't Harding. It wasn't the appellees in this case that declared the emergency. It was as a result of his engineer's activities. That's supported at the record, supported in the record in the supplemental excerpt at number 58. We got some references to the quantity of contaminant during oral argument. What does the record show? There's nothing in the record to show what the quantity was. There's not a lot in the record to support several of the statements that were made in the opening, but I don't want to argue that again, but I would urge the Court and its staff to review the record to see if it's supported. At this point in time, I would entertain any questions that the Court might have, but I have nothing else to add other than that. Is there a mention in the record as to the amount projected by Mr. Hager's engineers for the remedial action? There is what's called a corrective action plan, which is in the record, and the corrective action plan delineates what's called the plume and indicates what corrective action is going to be necessary, and then they do a remediation plan based upon that. They don't make a determination as to how much or what the quantities are that are actually in the soils. Okay. Any further questions? Thank you very much. Thank you. Harding was always involved in this case. Harding was the contractor for two years prior to the time that this case came into being. In 1996, they entered into the contract, which was after a series of contracts that they had entered into with the State to advise them. Harding was always advising the State of Nevada's Department of Environmental Protection. Whether Harding was in charge of making the determination for the State to take over is an issue of fact, an issue of fact that it is a dispute of a material fact that should be taken to the trier of fact and not determined on summary judgment. Keep in mind, when Mr. Hager had to go to bankruptcy to sell this property, within 60 days after the sale it was listed for a price of $2.65 million, within 15 months it sold for over $2 million. There was a distinct forced fire sale that was required because of the pressure put on him. Speaking to the issue quickly of the nexus between the State and Harding, the briefing paper cites Sutton v. Providence St. Joseph Medical Center determined by this court. There is no specific formula. The circumstances of each case determines whether there is a sufficient nexus. I submit to you we did give the lower court sufficient facts. That is an issue of fact that should be determined by the trier of fact and not subject to a motion for summary judgment. It is true that the State forced a corrective action plan. There was still a dispute, a constant dispute with regard to whether anything should be cleaned up on this site. Our second expert submitted the information regarding the quantity, which is a part of this record. He then untimely died. That's when we heard the second expert that went through the 44 boxes and showed that not only was the recovery not necessary, but there was overcharging all the way through. And, yes, this could be repeated again and again because of the situation with the contract, the advising of the State, as well as the recovery. Thank you. Thank you, Counselor. The case just argued is submitted for decision. We'll hear the next case on the calendar, our Children's Earth Foundation v. the EPA.
judges: Schroeder, McKeown, Duffy